## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARY DALTON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>OLD SECOND BANCORP, INC., OLD SECOND NATIONAL BANK, EMPLOYEE BENEFITS COMMITTEE OF OLD SECOND BANCORP, INC., J. DOUGLAS CHEATHAM, JAMES ECCHER, WILLIAM B. SKOGLUND, ROBERT DICOSOLA, and DOES 1-10.<br><br>Defendants. | **CIVIL ACTION NO**.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Mary Dalton ("Plaintiff"), participant in the Old Second Bancorp, Inc. Employees' 401(k) Savings Plan and Trust (the "Plan") during the proposed Class Period (defined below), alleges as follows on behalf of the Plan, herself and a class of all others similarly situated:

### INTRODUCTION

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries.

2.      Plaintiff was a participant in the Plan during the Class Period, during which time the Plan held interests in the common stock of Old Second Bancorp, Inc. (also referred to herein as "Old Second" or the "Company"). Plaintiff's retirement investment portfolios in the Plan during the Class Period included Old Second stock.

3.     401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals.  An employee participating in a 401(k) plan may have the option of purchasing the common stock of his or her employer, often the sponsor of the plan, for part of his or her retirement investment portfolio.  Common stock of Old Second was one of the investment alternatives of the Plan throughout the Class Period.

4.     Plaintiff alleges that Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties owed to her and to the other participants and beneficiaries of the Plan in violation of ERISA §§ 404(a) and 405, 29 U.S.C. §§ 1104(a) and 1105, particularly with regard to the Plan's holdings of Old Second stock.

5.     Specifically, Plaintiff alleges in Count I that Defendants, each having certain responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to her, the Plan and proposed Class by failing to prudently and loyally manage the Plan's investment in Company equity by:  (1) continuing to offer Old Second common stock as a Plan investment option when it was imprudent to do so; (2) failing to provide complete and accurate information to Plan participants regarding the Company's financial condition and the prudence of investing in Company stock; and (3) maintaining the Plan's pre-existing significant investment in Old Second equity when Company stock was no longer a prudent investment for the Plan.  These actions/inactions run directly counter to the express purpose of ERISA pension plans, which are designed to help provide retirement funds for participants.  *See* ERISA § 2, 29 U.S.C.  §  1001  ("CONGRESSIONAL  FINDINGS  AND  DECLARATION  OF POLICY").Plaintiff's Count II alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets

was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue offering Old Second stock as an investment option and investing Plan assets in Old Second stock when it was no longer prudent to do so.

7.    Plaintiff alleges that Defendants allowed the imprudent investment of the Plan's assets in Old Second equity throughout the Class Period despite the fact that they clearly knew or should have known that such investment was imprudent because, as explained in detail below and among other things: (a) the Company was overexposed to substantial losses from residential construction and development loans; (b) the Company was facing an increasing and excessive amount of nonperforming loans; (c) the Company would be required to continuously raise the amount of its loan loss reserves due to nonperforming loans; (d) the Company was undercapitalized; (e) two months prior to the beginning of the Class Period, the Company substantially increased the amount of nonperforming loans in its portfolio, with its acquisition of HeritageBanc, Inc. ("Heritage"), while the Plan simultaneously doubled its holdings of Company stock; and (f) as a consequence of the above, the Plan's heavy investment of employees' retirement savings in Company stock would inevitably result in significant losses to the Plan and, consequently, to the Plan's participants.

8.    This action is brought on behalf of the Plan, and seeks losses to the Plan for which Defendants are liable pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132. Because Plaintiff's claims apply to the Plan, inclusive of all participants with accounts invested in Company stock during the Class Period, and because ERISA specifically authorizes participants such as Plaintiff to sue for relief to the Plan for breaches of fiduciary duty such as those alleged

herein, Plaintiff brings this action as a class action on behalf of the Plan and all participants and beneficiaries of the Plan during the proposed Class Period.

A.     **JURISDICTION AND VENUE**

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

10.    Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and Old Second has its principal place of business in this district. Further, many of the Plan's participants are located in or within close proximity to this district.

B.     **PARTIES**

**Plaintiffs**

11.    Plaintiff Mary Dalton is a "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Old Second shares in her retirement investment portfolio during the Class Period.

**Defendants**

(a)     **Old Second**

12.    Defendant Old Second was the sponsor and administrator of the Plan. *See* 2008 Form 5500 for the Plan, filed with the Department of Labor and the Department of the Treasury (the "2008 Form 5500"), attached hereto as Exhibit A. Old Second was a fiduciary of the Plan and exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. At all relevant times, the Company acted through its Board of Directors (the "Board") and certain officers/employees, including without limitation, its Chairman and Chief Executive Officer ("CEO"), its Executive Vice

President, Human Resources, and the Employee Benefits Committee ("Benefits Committee"), the designated Plan administrator.

### (b) **Old Second National Bank**

13.     Defendant Old Second National Bank (the "Bank"), the Company's principal subsidiary, served as the Plan's trustee during the Class Period. Upon information and belief, the Bank was a fiduciary of the Plan because it exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

### (c) **Director Defendants**

14.     Defendant J. Douglas Cheatham ("Cheatham") served as a member of the Board during the Class Period. Further, Defendant Cheatham served as the Company's Executive Vice President and Chief Financial Officer ("CFO") during the Class Period and as Senior Vice President, CFO, Chief Accounting Officer and Assistant Secretary of the Company from 2003 until 2007. During the Class Period, Defendant Cheatham signed the Company's 2008 and 2009 Form 11-K Plan annual report submissions filed with the Securities and Exchange Commission ("SEC"). Defendant Cheatham was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

15.     Defendant James Eccher ("Eccher") served as a member of the Board during the Class Period. Further, Defendant Eccher served as the Company's Executive Vice President and Chief Operating Officer ("COO") and as President and CEO of the Bank during the Class Period. Defendant Eccher also served as Senior Vice President and Branch Director of the Bank from 1999 until 2003. Defendant Eccher was a fiduciary of the Plan, within the meaning of ERISA

Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

16.     Defendant William B. Skoglund ("Skoglund") served as a member of the Board during the Class Period.  Further, Defendant Skoglund served as the Company's Chairman and CEO and as Chairman of the Bank during the Class Period.  During the Class Period, Defendant Skoglund signed the Company's 2008 and 2009 Form 11-K submissions for the Plan filed with the SEC.  Defendant Skoglund was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

### C.     DEFENDANTS CHEATHAM, ECCHER AND SKOGLUND ARE, COLLECTIVELY, THE "DIRECTOR DEFENDANTS."

#### (a)     Benefits Committee

17.     Defendant Employee Benefits Committee of Old Second ("Benefits Committee") was the Plan Administrator and likely a Named Fiduciary of the Plan.

18.     Defendant Robert DiCosola ("DiCosola") served as a member of the Benefits Committee and as the Company's Executive Vice President, Human Resources, during the Class Period.  Defendant DiCosola was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

D. **DEFENDANT DICOSOLA AND THE OTHER MEMBERS OF THE BENEFITS COMMITTEE ARE, COLLECTIVELY, THE "BENEFITS COMMITTEE DEFENDANTS."**

(a) **Additional "John Doe" Defendants**

19. To the extent that there are additional Company officers, directors and employees who were fiduciaries of the Plan during the Class Period, including members of the Benefits Committee, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 1-10 include other individuals, including Company officers, directors and employees who were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

E. **THE PLAN[1]**

20. The Plan is an "employee pension benefit plan," as defined by ERISA § 3(2)(A). Specifically, the Plan is a "defined contribution plan" within the meaning of ERISA § 3(34). The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither a defendant nor a plaintiff. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

21. The stated purpose of the Plan is "to provide deferred compensation benefits to eligible employees."

22. Under the Plan, all nonunion employees of Old Second and certain of its subsidiaries who have met certain eligibility requirements may elect to participate in the Plan.

23. Under provisions of the Plan, participants enter into agreements wherein each participant may elect an unlimited reduction in compensation (subject to statutory wage

---

[1] The information in this section is derived from the 2008 Form 5500.

limitations). Maximum contribution limits of compensation may apply for certain highly compensated employees. Effective May 1, 2009, the Company contributes on behalf of each participant a Basic Matching Contribution. This contribution is equal to 100% of the participant's deferral contributions up to 3% of the participant's compensation plus 50% of the deferrals that exceed 3% of compensation but do not exceed 5% of the participant's compensation. Prior to May 1, 2009 the Company contributed on behalf of each participant an amount equal to 100% of the participant's deferral contributions made each pay period (safe harbor enhanced matching contribution), not to exceed 6% of the participant's compensation. Participants are 100% vested in the Basic Safe Harbor Matching Contribution. For purposes of calculating the Safe Harbor Matching Contribution, compensation and deferrals will be determined on the entire Plan year. Participants must complete three months of service to be eligible for matching contributions, with the entry date being the first of the quarter coincident with or next following the employee's three-month anniversary.

24.     Participants can also receive Company contributions in the form of profit-sharing contributions. Participants must complete one year of service with the Company to be eligible for profit-sharing contributions with the earliest entry date being the first of the quarter coincident with or next following their one year anniversary date. Profit-sharing contributions are based on amounts determined by the Board before the end of each year and shall not exceed the maximum amount deductible for federal income tax purposes.

25.     Participants who have attained age 50 before the end of the Plan year are eligible to make catch-up contributions. Participants may also contribute amounts representing distributions from other qualified defined benefit or defined contribution plans.

26.     Each participant's account is credited with the participant's contributions and allocations of: (a) Company contributions, and (b) Plan earnings (losses). Allocations are based on participant earnings or account balances. The benefit to which a participant is entitled is the benefit that can be provided from the participant's account. Participants are always fully vested in their employee contributions, rollover contributions, and company safe harbor matching contributions, and earnings thereon. Profit sharing contributions made prior to the 2007 plan year vest under a 5-year cliff-vesting schedule. As of January 1, 2007, profit sharing contributions vest under a 6-year graded schedule as follows:

| Years of vesting service | Nonforfeitable percentage |
|---|---|
| 0-1 | 0% |
| 2 | 20% |
| 3 | 40% |
| 4 | 60% |
| 5 | 80% |
| 6 | 100% |

27.     The Plan offers several investment options, including Company stock.

28.     As of December 31, 2007, when Company stock was valued at $26.79 per share, the Plan held 643,615 shares of Company stock, valued at $17,242,446. In February 2008, in connection with the Company's acquisition of Heritage, an additional $25.2 million in Company stock was rolled over into the Plan[2].

F.     **CLASS ACTION ALLEGATIONS**

29.     Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plan, themselves and the following class of persons similarly situated (the "Class"):

---

[2] In connection with the merger, the Heritage Employee Stock Ownership Plan (the "Heritage ESOP") was terminated and shares of Heritage held by the Heritage ESOP were exchanged for shares of Old Second and then rolled over into the Plan.

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between April 25, 2008 and the present (the "Class Period") and whose Plan accounts included investments in Old Second common stock.

30.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are at least several hundred members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period and whose Plan accounts included investment in Old Second stock.[3]

31.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

    (a)    whether Defendants each owed a fiduciary duty to the Plan, Plaintiff and members of the Class;

    (b)    whether Defendants breached their fiduciary duties to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and Beneficiaries;

    (c)    whether Defendants violated ERISA; and

    (d)    whether the Plan and members of the Class have sustained damages and, if so, what is the proper measure of damages.

32.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plan and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

33.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions, complex, and ERISA

---

[3]  According to the 2008 Form 5500 filed on behalf of the Plan there were over 700 members in the Plan as of December 31, 2008.

litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Plan or the Class.

34.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

35.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

G.     **DEFENDANTS' FIDUCIARY STATUS**

36.     During the Class Period, upon information and belief, each Defendant was a fiduciary of the Plan, either as a named fiduciary or as a *de facto* fiduciary with discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

37.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

38.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control

respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

39.     Each of the Defendants was a fiduciary -- either as a named fiduciary or *de facto* fiduciary -- with respect to the Plan and owed fiduciary duties to the Plan and its participants under ERISA in the manner and to the extent set forth in the Plan documents, through their conduct, and under ERISA.

40.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

41.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

42.     Upon information and belief, instead of delegating all fiduciary responsibility for the Plan to external service providers, the Company chose to assign the appointment and removal of fiduciaries, such as the members of the Benefits Committee, to itself.

43.     ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

44.     During the Class Period, all of Defendants acted as fiduciaries of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

(a)     **Old Second's Fiduciary Status**

45.     During the Class Period, Old Second was the Sponsor and Administrator of the Plan, and likely a named fiduciary. *See* 2008 Form 5500. Upon information and belief, the Company appointed the members of the Benefits Committee.

46.     Additionally, during the Class Period, the Company exercised control over the activities of its employees that performed fiduciary functions with respect to the Plan, including the Benefits Committee Defendants, and, could hire, appoint, terminate, and replace such employees at will. Thus, the Company was responsible for the activities of its employees through traditional principles of agency and *respondeat superior* liability. Under basic tenets of corporate law, the Company is imputed with the knowledge that the individual Defendants had regarding the misconduct alleged herein, and, hence, like the fiduciaries who acted on the Company's behalf, had knowledge of the imprudent actions alleged herein.

47.     In light of the foregoing duties, responsibilities, and actions, Old Second was a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

(b)     **The Bank's Fiduciary Status**

48.     During the Class Period, the Bank served as Trustee of the Plan and was likely a named fiduciary. Further, upon information and belief, as Trustee, the Bank was a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period, in that it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

(c)     **Director Defendants' Fiduciary Status**

49.     Upon information and belief, the Board has primary oversight of the Plan. Further, upon information and belief, the Board has the authority to appoint and remove members of the Benefits Committee and, accordingly, the concomitant duty to monitor the members of the Benefits Committee, to whom the Company delegated certain fiduciary responsibilities concerning the administration and management of the Plan.

H.     **THE BENEFITS COMMITTEE DEFENDANTS' FIDUCIARY STATUS**

50.     Upon information and belief, the Benefits Committee was responsible for the day-to-day administration of the Plan and was likely a named fiduciary.

51.     The Benefits Committee was a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period, in that it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

(a)   **Additional Fiduciary Aspects of Defendants' Actions/Inactions**

52.   ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary functions. ERISA § 3(21)(A)(i), 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ."  During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

53.   Further, ERISA mandates that pension plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the Plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.  "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA."  *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996); *see also Peoria Union Stock Yards Co. Retirement Plan v. Penn Mut. Life Ins. Co.*, 698 F.2d 320, 326 (7th Cir. 1983).

54.   Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that plan participants will not be injured.  *See, e.g., Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 381 (4th Cir. 2001) ("[An] ERISA fiduciary that knows or should have known that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent – especially when that misunderstanding was fostered by fiduciary's own material representations or omissions."); *see also Kamler v. H/N Telecommunication Services, Inc.*, 305 F.3d 672, 681 (7th Cir. 2002) (Under ERISA, "material facts affecting the interests of plan participants or

beneficiaries must be disclosed."); *Lingis v. Motorola, Inc.*, 649 F. Supp. 2d 861, 876 (N.D. Ill. 2009) (noting "fiduciaries have a duty to correct their own misstatements made to beneficiaries")

55.     During the Class Period, upon information and belief, the Company made direct and indirect communications with the Plan's participants including statements regarding investments in Company stock. These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions ("SPDs") and/or prospectuses regarding Plan/participant holdings of Company stock), which included and/or reiterated these statements. Upon information and belief, at all times during the Class Period, Old Second's SEC filings were incorporated into and part of such SPDs and/or a prospectuses. Thus, Defendants also acted as fiduciaries to the extent of their communications with Plan participants.

56.     Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the 401(k) literature and the trade press,[4] concerning investment in company stock, including that:

(a)     Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

(b)     Out of loyalty, employees tend to invest in company stock;

(c)     Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

---

[4]  Joanne Sammer, *Managed Accounts: A new direction for 401(k) plans*, Journal of Accountancy, Vol. 204, No. 2 (August 2007) (available at: http://www.aicpa.org/pubs/jofa/aug2007/sammer.htm); Roland Jones, *How Americans Mess Up Their 401(k)s*, MSNBC.com (June 20, 2006) (available at: http://www.msnbc.msn.com/id/12976549/); Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001) (available at: http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plan - the importance of plan design*, Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.) (available at: http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

(d) Employees tend not to change their investment option allocations in the plan once made;

(e) No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

(f) Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(g) Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with its rewards.

57. Even though Defendants knew or should have known these facts, and even though Defendants knew of the substantial investment of the Plan's funds in Company stock, they still took no action to protect the Plan's assets from their imprudent investment in Company stock.

I. **SUBSTANTIVE ALLEGATIONS**

58. Throughout the Class Period, Old Second was the holding company of the Bank, its primary subsidiary. In addition to offering traditional banking, trust and mortgage banking services in northeastern Illinois, the Bank relied heavily on making loans to residential real estate developers.

59. Throughout the Class Period, Defendants knew or should have known that Old Second stock was an imprudent Plan investment because: (a) the Company was overexposed to substantial losses from souring residential construction and development loans; (b) the Company was facing an increasing and excessive amount of nonperforming loans; (c) the Company would be required to continuously raise the amount of its loan loss reserves; (d) the Company was undercapitalized; (e) prior to the beginning of the Class Period, the Company substantially increased the amount of nonperforming loans in its portfolio, with its acquisition of Heritage, while simultaneously more than doubling the Plan's holdings of Company stock; and (f) as a

consequence of the above, the Plan's heavy investment of employees' retirement savings in Company stock would inevitably result in significant losses to the Plan and, consequently, to the Plan's participants.

60.     Defendants knew or should have known all of these facts – and thus knew or should have known that Company stock was an imprudent investment for the Plan—yet wholly failed to take any actions to protect the interests of the Plan participants.  As a result of Defendants' breaches of fiduciary duty, the Plan suffered enormous losses.  A prudent fiduciary facing similar circumstances would not have stood idly by as the Plan lost such a significant percentage of its value.

(a)     **Old Second Became Exposed to Devastating Losses as the Residential Real Estate Construction Industry Crashed**

61.     On October 26, 2006, the U.S. Census Bureau released a report showing that home builders were being forced to cut prices in order to sell homes.  On the same day, during a conference in Washington, D.C., David Seiders, chief economist of the National Association of Home Builders, predicted, for the first time in ten years, a drop in the price of single-family homes.

62.     The following day, on October 27, 2006, leading construction industry analyst McGraw-Hill Construction released a closely-watched report forecasting the first decline in overall construction spending since 1991.  As the Wall Street Journal reported:

> The unexpectedly rapid decline of the nation's housing market will mean an overall drop in construction spending next year, with spillover effects in areas such as job growth and real-estate development…Some of the negative effects from the housing slump are likely to linger well into 2007 and perhaps much longer.

*See* Alex Frangos, *Housing Decline Sparks Slowdown in Construction*, Wall Street Journal

(October 27, 2006), available at:

http://online.wsj.com/article/SB116191573939805588.html?mod=djemalert.

63.    By the end of 2007 and the beginning of 2008, the perils facing the residential

construction industry were clear, as new construction in the Midwest had suffered a steady

decline during 2006 and 2007, as indicated below:

**U.S. Residential Building Construction**
(thousands of units)

|         | 2006   | 2007   |
|---------|--------|--------|
| Midwest | 285    | 206    |
|         | -20.2% | -27.7% |

*Source*: Reed Construction Data.  Analysts predicted that this trend would continue into 2008.

*See, e.g.*, Alex Chadwick, *Regional Housing Starts End Badly in 2007*, Reed Construction Data

(February 12, 2008), available at: http://www.reedconstructiondata.com/construction-

forecast/news/2008/02/regional-housing-starts-end-badly-in-2007/.

J.    **AS ONE EXPERT NOTED:**

> At the peak of the housing boom in 2005, home building
> contributed more than $768 billion to the U.S. economy. In 2007
> this contribution shrunk to $641 billion, a 16.6 percent decline, and
> the slide continued further in the first quarter of 2008. In real terms
> (*i.e.*, adjusted for inflation) the decline from 2005 to 2007 was an
> even more dramatic 20.8 percent. When calculated from the peak
> final quarter of 2005 to the current bottom in the first quarter of
> 2008 it registers an even more striking 33.9 percent decline.

*See* Natalia Siniavskaia, Ph.D., *The Effect of the Home Building Contraction on State*

*Economies*, HousingEconomics.com (August 1, 2008), available at:

http://www.nahb.org/generic.aspx?sectionID=734&genericContentID=99676&channelID=311.

64.     Illinois was one of the states hardest hit by this contraction. *See Id*, Table 1. This would prove to be problematic for Old Second, the business of which in large part consisted of making loans to homebuilders.

65.     However, as the housing slump worsened, rather than reduce its exposure to loan losses, Old Second focused on expansion. On November 5, 2007, the Company agreed to acquire Heritage for $86 million in cash and stock. Pursuant to the merger, Old Second would merge Heritage Bank, a wholly-owned subsidiary of Heritage, into Old Second National Bank (previously and hereinafter referred to as the "Bank"), with the Bank as the surviving entity.

66.     Meanwhile, an increasing percentage of construction and development loans were becoming delinquent. For example, on January 14, 2008, Bloomberg reported that, according to analysts at Friedman, Billings, Ramsey & Co., "U.S. construction loans that were 30 days to 89 days overdue represented 0.7 percent of those outstanding in the third quarter, **more than double the rate of a year earlier.**" *See* Bradley Keoun and Elizabeth Hester, *Wall Street's $35 Billion Writedown Squeezes Profits*, Bloomberg.com (January 14, 2008), available at: http://www.bloomberg.com/apps/news?pid=21070001&sid=a1r8gcqTEmD4 (emphasis added).

67.     On February 8, 2008, Old Second completed its purchase of Heritage. In connection therewith, the Company acquired from Heritage approximately $53.6 million in problem loans, as further described below.

68.     Later that month, the Standard & Poor's/Case-Shiller home price index indicated that U.S. home prices dropped 8.9 percent in the final quarter of 2007 compared with the prior year period—the steepest decline in the index's 20-year history. As the Associated Press reported:

> Builders across the nation are slashing prices, giving upgrades,
> even offering trade-ins to sell homes from an inventory that's near

record levels. **Residential construction, meanwhile, has fallen 60 percent from the peak.**

*See* J.W. Elphinstone, *Reports Reflect Bleak Housing Picture*, Associated Press (February 26, 2008), available at: http://www.foxnews.com/wires/2008Feb26/0,4670,HomePrices,00.html (emphasis added).

69.     In an article published on April 16, 2008, Bloomberg reported the slump in residential construction and development was showing no sign of improvement and, indeed, was expected to worsen. In part, the article stated:

> Residential building has subtracted from economic growth since the first three months of 2006, culminating in a 25 percent decline last year that was the biggest since 1980...The National Association of Home Builders yesterday forecast housing starts would fall 30 percent this year, compared with a previously estimated 27 percent drop, as the credit crisis persists... Homebuilders are also pessimistic. The National Association of Homebuilders said yesterday its confidence index held near a record low this month.

See Bob Willis, U.S. Housing Starts Slide to Lowest Level in 17 Years, Bloomberg.com (April 16, 2008), available at:

http://www.bloomberg.com/apps/news?pid=21070001&sid=a2WtOEVhSUQM.

70.     By April 25, 2008, the beginning of the Class Period, there were certainly numerous warning signs that, because of its heavy exposure to losses from residential construction and developments loans, Old Second was on the brink of a major crisis and that the Company's stock was an imprudent Plan investment. Defendants' however, took no action to protect the Plan from its substantial holdings of Company stock.

71.     On this day, Old Second announced its financial results for the first quarter of 2008 and revealed that, whereas there had been no provision for loan losses in the fourth quarter

of 2007, the Company recorded a $900,000 provision for loan losses in first quarter of 2008. In stark contrast, the Company had recorded a $1.2 million provision for the full year of 2007.

72.     In its first quarter earnings press release, the Company also said that nonperforming loans had more than doubled in just three months and increased by more than sevenfold over the prior year period. Specifically, the Company stated that its nonperforming loans increased from $1.7 million at March 31, 2007 and $6.0 million at December 31, 2007 to $13.3 million at March 31, 2008.

73.     In connection with the April 25, 2008, earnings announcement and in reference to the Company's acquisition of Heritage, Defendant Skoglund touted the strength of the Company's financial condition. He stated that the Company would begin to realize the economic benefits of the Heritage acquisition in the second quarter of 2008 and added, "In addition to cost saves, the Company also expects to realize revenue enhancements by applying its relationship focused banking strategies, which include offering the new client base wealth management services, as well as expanded mortgage, treasury and retail services in addition to the traditional loan and deposit products previously offered by Heritage."

74.     However, as Defendants knew or should known, the Company's condition was actually worsening substantially, as significant declines in residential construction continued and Old Second was relying heavily on the strength of its residential construction loan portfolio. As this sector deteriorated, Old Second quickly lost much of its luster.

(b)     **The Company's Halo Vanishes as its Loan Losses Mount, Yet the Company Refuses to Face the Truth Concerning its Financial Condition**

75.     Consequently, beginning in May 2008, Old Second stock began a dramatic decline. In fact, by the beginning of July 2008, Old Second stock had plummeted to approximately $12.00 per share—a **50 percent** drop from the beginning of the Class Period.

Simply put, and as Defendants knew or should have known, the Company's business model heavily depended upon a booming residential construction industry. However, housing prices were continuing to tumble and the future looked bleak. In the Chicago area, housing prices were 9.4% lower during July 2008 than they were a year earlier. *See Falling Prices Feed into Housing Woes; Nine Cities Post Biggest Declines in Index's History*, Chicago Tribune (July 30, 2008).

76.     When the Company filed its 2007 Form 11-K with the SEC on July 3, 2008, it noted that, in February 2008, when Company stock was trading above $25 per share, an additional $25.2 million in Company stock was rolled into the Plan in connection with the Heritage acquisition. By this time, however, the Company's stock price was down to $11.55 per share.

77.     For the second quarter of 2008, Old Second recorded provisions for loan losses of $1.9 million for the quarter. Further, in its July 18, 2008, earnings press release, the Company said that its nonperforming loans jumped to $30.7 million. However, the Company downplayed any long-term impact and provided assurances that its provisions for loan losses were adequate. In the earnings release, with respect to the loan loss allowance, Defendant Skoglund stated, "We have a long history of strong underwriting and the economy has held up better in our market areas as compared to other parts of the country experiencing more dramatic price adjustments. Therefore, we are comfortable with the allowance as it stands, although if our market areas are affected in the future there may be an effect on the level of nonperforming loans."

78.     Meanwhile, as reported by the *Chicago Tribune* on August 14, 2008, in an article entitled "Home Sales in State Decline 25%," Illinois home sales had dropped 25% in the second quarter of 2008. In the city of Chicago, sales dropped 28%.

79.     On October 24, 2008, Old Second reported that, by the end of the third quarter of 2008, its recorded loan loss provision had swollen to $9.1 million for the nine months ended September 30, 2008, including an addition of $6.3 million in the third quarter.  Additionally, Old Second reported that nonperforming loans had increased to $65.7 million at September 30, 2008, a gargantuan increase from the $6.0 million in nonperforming loans reported for the beginning of the year.  However, in its earnings press release issued on October 24, 2008, the Company downplayed the significance of these numbers and emphasized its "history of strong underwriting."  Further, Defendant Skoglund stated that the Company would "continue as a profitable, **well capitalized** institution that remains focused upon traditional lending products and strong underwriting standards" (emphasis added).

80.     On January 23, 2009, while announcing its financial results for the fourth quarter of 2008, Old Second revealed more devastating and disturbing news.  The Company had recorded an $18.9 million provision for loan losses in 2008, including an addition of $9.8 million in the fourth quarter alone.  Further, the Company said that approximately $9.0 million of the December 31, 2008 problem loan total was acquired through the Heritage acquisition.

81.     Additionally, in its January 23, 2009 press release, Old Second said that nonperforming loans increased a stunning **$85.9 million** from $6.0 million at December 31, 2007 to $91.9 million at December 31, 2008, while the ratio of allowance for loan losses to nonperforming loans was 32.5% at December 31, 2008 as compared to 282% at December 31, 2007.

82.     Just a few months later, the Company was forced to revise its reported earnings for the three months and twelve months ended December 31, 2008, "to reflect an increase in its allowance for loan losses."  Specifically, on March 13, 2009, Old Second announced that "as a

result of continuing analysis of the loan portfolio, the Company's management has deemed it prudent to record an additional loan loss provision of $11.4 million for the fourth quarter of 2008. This additional provision results in a total provision of $21.2 million for the fourth quarter and $30.3 million for the full year 2008."

83. The Company stated that this provision was in addition to the $9.8 million originally expensed for the quarter, and that revised net income for the year ended December 31, 2008 was now $11.8 million, or $0.86 per diluted share. This action brought Old Second's allowance for loan losses to 1.82% of total loans, as compared to 1.31% of total loans as initially reported. Moreover, nonperforming loans increased to $108.6 million, as compared to the originally reported $91.9 million. On this day, Old Second stock closed at $5.41 per share.

84. Old Second filed its 2008 annual report on Form 10-K on March 16, 2009. Therein, the Company acknowledged that approximately $53.6 million of the December 31, 2008 problem loan total was acquired through the Heritage acquisition. The Company stated that these loans had a total specific allocation estimate of $2.9 million at December 31, 2008 and that "[m]anagement believed that the $3.0 million allowance for loan losses assumed in the Heritage transaction in the first quarter was adequate to address the risks specific to the loan portfolio purchased." Old Second Bancorp, Annual Report (Form 10-K), at 48 (March 16, 2009).

85. The Company Struggles to Raise Capital, as the Value of its Stock Continues to Plummet and the SEC Questions its Treatment of Problem Loans Acquired from Heritage.

86. Despite Old Second's repeated assurances concerning the adequacy of its capital and loan loss reserves, analysts were not convinced. For example, responding to Old Second's 2008 annual report, investment firm Keefe Bruyette & Woods ("KBW") stated that Old Second's

loan-loss reserves remain "modest" to cover rising delinquencies. More specifically, KBW was "concerned about [Old Second's] reserve levels, given its construction and development exposure in the suburban Chicago market, as well as its modest tangible common equity position."

87. In its first quarter 2009 earnings report, issued on April 24, 2009, Old Second announced that "performance for the quarter was unfavorably impacted by a high level of provision for loan losses, a result of the underlying weaknesses in the economy." Old Second Bancorp, Current Report (Form 8-K), at 1 (April 24, 2009). For the first quarter of the year, the Company recorded a $9.4 million provision for loan losses, while nonperforming loans increased to $123.7 million. Also as of March 31, 2009, the ratio of allowance for loan losses to nonperforming loans was 37.42%. Old Second insisted that, although this ratio decreased as compared to 2008, "management believed the allowance coverage was sufficient due to the estimated loss potential" and that "[t]he Company continues with a strong capital position..." *Id.* at 4.

88. The SEC, however, was not convinced. Three days later, on April 27, 2009, the SEC sent a letter to Defendant Cheatham regarding the Company's Form 10-K filed on March 16, 2009. *See* Letter from Christian Windsor, Special Counsel, SEC, to J. Douglas Cheatham, Old Second Executive Vice President and CFO (April 27, 2009), attached hereto as <u>Exhibit B</u>. The SEC had a number of questions about the filing and requested clarification on a number of issues. The SEC noted the Company's disclosure that approximately $53.6 million of the problem loan total was acquired through the Heritage acquisition and noted that the Company carried over approximately $3 million of allowance related to the loans acquired from Heritage Bank. *See Id* at 3.

89.     With respect to the Heritage acquisition, the SEC inquired as to how Old Second considered whether any of the acquired loans were within the scope of Statement of Position ("SOP") 03-3 on the acquisition date. *See Id* at 3. SOP-03, issued by the American Institute of Certified Public Accountants on December 12, 2003, requires loans acquired through a transfer, such as a business combination, where there are differences in expected cash flows and contractual cash flows due in part to credit quality, be recognized at their fair value.

90.     Further, the SEC noted "significant unrealized losses" related to collateralized debt obligations (backed by trust preferred securities), and asked for a detailed analysis of the securities' impairment as of December 31, 2008 that "identifies all available evidence, explains the relative significance of each piece of evidence, and identifies the primary evidence on which [Defendants] rely to support a realizable value equal to or greater than the carrying value of the investment." *See Id* at 3. On May 20, 2009, Old Second filed its responses to the SEC's April 27, 2009 letter, attempting to answer the questions posed to the Company. In this letter, Old Second attempted to justify all of its actions, stating its belief that all of its accounting methods were true and correct. *See* Letter from J. Douglas Cheatham, Old Second Executive Vice President and CFO, to Christian Windsor, Special Counsel, SEC (May 20, 2009), attached hereto as Exhibit C.

91.     On June 29, 2009, the Company filed with the SEC its Form 11-K for the year ended December 31, 2008. The Form 11-K revealed that at December 31, 2008, the Plan had 1,573,246 shares of Old Second stock, valued at $18,249,654. This meant that since December 31, 2007, despite the Company's debilitating losses, the Plan's investment portfolio experienced a net increase of 929,631 shares of Old Second stock. However, despite this significant and imprudent addition of shares to the Plan, due to the accelerating decline in the value of the

Company's shares, the total value of the shares in the Plan as of December 31, 2008 was just over $1 million more than it was at December 31, 2007, while far fewer Company shares were invested in the Plan.

92. On July 24, 2009, Old Second filed a Current Report on Form 8-K, wherein its reported its financial results for the second quarter of 2009. The Company announced a dismal loss of $4.29 per diluted share for the second quarter of 2009 on $58.4 million of net loss. The Company revealed that its provision for loan losses in the first half of 2009 was $56.9 million, including an addition of $47.5 million in that quarter. Further, Old Second said that nonperforming loans increased to $178.6 million at June 30, 2009. Old Second's Quarterly Form 10-Q report filed on November 9, 2009, indicated that results were no better for the third quarter of 2009, with the Company recording a $66.6 million provision for loan losses in the nine months ended September 30, 2009, including an addition of $9.7 million in the third quarter, and seeing nonperforming loans increase to $176.1 million.

93. On January 27, 2010, Old Second announced its financial results for the fourth fiscal quarter ended December 31, 2009. The Company recorded an $86.7 million provision for loan losses in 2009, including an addition of $20.1 million for the quarter, while nonperforming loans increased to $199.4 million at December 31, 2009. Additionally, Old Second announced a quarterly loss of $0.34 per diluted share on $3.6 million of net loss, and a loss for the year ending December 31, 2009 of $4.60 per diluted share on $59.6 million in net loss.

94. However, the Company continued to insist that it was well capitalized. Specifically, commenting on the financial results, Defendant Skoglund stated that Old Second was carefully monitoring its capital levels and strengthened capital levels at both the Company and the Bank in 2009.

95.     Less than two months later, on March 12, 2010, Old Second once again announced revised earnings to reflect an increase in its allowance for loan losses. The Company said that, "as a result of continuing analysis of the loan portfolio, the Company's management has deemed it prudent to record an additional loan loss provision of $10.0 million for the fourth quarter of 2009. This additional provision results in a total provision of $30.1 million for the fourth quarter and $96.7 million for the full year 2009." This provision was in addition to the $20.1 million originally expensed for the quarter.

96.     On April 26, 2010, Old Second announced its financial results for the first quarter ended March 31, 2010 and disclosed that it recorded a $19.2 million provision for loan losses, while nonperforming loans increased to $192.7 million at March 31, 2010.

97.     Despite the Company's above-mentioned assurances, concerning its capital levels, it was in serious trouble. On June 22, 2010, Old Second issued a press release, disclosing, in part, that it had entered into a memorandum of understanding in 2009 with its principal regulator, the U.S. Office of the Comptroller of the Currency (the "OCC"). Under the agreement, the Company agreed to implement a variety of programs and policies designed to reduce the level of credit risk in the Bank. The Company also agreed with the OCC to take steps to maintain the Bank's regulatory capital ratios at levels in excess of the general minimums required to be considered "well capitalized" under OCC regulations.

98.     On June 22, 2010, Old Second also announced that in an effort to strengthen its capital position, it had commenced an offer to exchange a portion of the $31.6 million outstanding liquidation amount of the 7.80% Capital Securities issued by Old Second Capital Trust I for newly issued shares of common stock of the Company. Old Second stated that this

was the "first component of a multi-faceted capital strategy designed to strengthen the Company's financial position."

99.     On June 28, 2010, *ChicagoBusiness.com* published an article that discussed Old Second's agreement with the OCC and noted that the Company was "struggling with a heavy load of soured construction and development loans." The article also pointed out that Old Second's plan for raising capital had been pursued unsuccessfully earlier in 2010 by another similarly sized, publicly traded, troubled local lender, Melrose Park-based Midwest Banc Holdings Inc. Additionally, the article observed that "Old Second's stock has been pounded on recent speculation that it will have to raise substantial equity to stay afloat. The stock price has dropped nearly 60% in the past two months and now is trading at around $2.70 per share." *See* Steve Daniels, *Old Second Bancorp Discloses Regulator Order, Plans to Raise Capital*, ChicagoBusiness.com (June 28, 2010), available at:

http://www.chicagobusiness.com/article/20100628/NEWS01/200038703/old-second-bancorp-discloses-regulator-order-plans-to-raise-capital#axzz18DmgDhzy.

100.     On July 22, 2010, Old Second announced its financial results for the second fiscal quarter ended June 30, 2010 and revealed a provision for loan losses of $44.6 million with an increase in nonperforming loans to $242.9 million as of June 30, 2010.

101.     On the same day, the Company said that, as of June 30, 2010, the Bank was not in compliance with the general minimums required to be considered "well capitalized" under the regulations of the OCC. Specifically, Old Second said, "because of the net loss incurred during the second quarter of 2010, the Bank's Tier 1 capital ratio declined to 7.76% and its total risk-based capital ratio declined to 10.73%. Accordingly, the Bank was not in compliance with the heightened capital ratios as of June 30, 2010."

102.    On August 31, 2010, *ChicagoBusiness.com* published an article that highlighted a number of adverse issues facing Old Second, including the Company's overexposure to residential development loans in the Chicago suburbs and the fact that the Company had been forced to cancel its previously discussed offering to swap common stock for trust-preferred securities because of its low stock price. Further, Old Second was delaying any issuance of new common stock in order to raise equity. Further, the article discussed the fact that Old Second would stop paying dividends to the Treasury under the Troubled Asset Relief Program ("TARP")[5]. *See* Steve Daniels, *Old Second Bancorp Stops TARP Dividend Payments*, ChicagoBusiness.com (August 31, 2010), available at:

http://www.chicagobusiness.com/article/20100831/NEWS01/100839970/old-second-bancorp-stops-tarp-dividend-payments#axzz18DoynPY1. Two days later, Old Second stock fell to 72 cents per share.

103.    On January 14, 2011, ChicagoBusiness.com reported that Old Second's Chief Risk Officer, Rodney Sloan, "left his job abruptly." *See* Steve Daniels, *Old Second Bancorp Risk Officer Rodney Sloan Resigns*, ChicagoBusiness.com (January 18, 2011), available at:

http://www.chicagobusiness.com/article/20110118/NEWS01/110119846/old-second-bancorp-risk-officer-rodney-sloan-resigns#axzz1DglnfbWy, accessed February 11, 2011.

104.    On February 4, 2011, Old Second stock plummeted 18.5% after the Company reported a $76.6 million loss for the fourth quarter of 2008. In a related article, the Chicago

---

[5] TARP allows the United States Department of the Treasury to purchase or insure up to $700 billion of "troubled" assets. "Troubled assets" are defined as: (A) residential or commercial mortgages and any securities, obligations, or other instruments that are based on or related to such mortgages, that in each case was originated or issued on or before March 14, 2008, the purchase of which the Secretary determines promotes financial market stability; and (B) any other financial instrument that the Secretary, after consultation with the Chairman of the Board of Governors of the Federal Reserve System, determines the purchase of which is necessary to promote financial market stability, but only upon transmittal of such determination, in writing, to the appropriate committees of Congress. *See A Congressional Budget Office Report: The Troubled Asset Relief Program: Report on Transactions Through December 31, 2008*, at 1 (January 20, 2009).

Tribune noted that investors were questioning the company's ability to survive in light of its high level of bad assets, as well as its low capital ratios. The article also noted that as of December 31, 2010, Old Second's nonperforming assets were $308 million, or 14.5 percent of total assets, whereas, at the end of the third quarter of 2008, Illinois lenders on average reported that 2.97 percent of assets were nonperforming. *See* Becky Yerak, Aurora Bank Shares Tumble 18.5% After Big Quarterly Loss, Chicago Tribune (February 4, 2011), available at:

http://www.chicagotribune.com/business/ct-biz-0204-old-second--

20110204,0,198890,print.story

105. Since that time, Company has continued to flounder and is currently trading for approximately $1.05 per share.

106. Defendants, as fiduciaries of the Plan, were obligated to continuously ensure that the Plan's assets were prudently invested. However, Defendants failed to do so, to the substantial detriment of the Plan and its participants.

107. As a result of the enormous erosion in the value of Company stock, the Plan's participants, the retirement savings of whom were heavily invested in Old Second stock, suffered unnecessary and unacceptable losses, as indicated below:



*Source*: http:www.bigcharts.com.

> (c)     **Defendants Knew or Should Have Known That Old Second Stock Was an Imprudent Investment for the Plan, Yet Took No Action**

108.     During the Class Period, although they knew or should have known that the Company's stock was an imprudent Plan investment, Defendants did nothing to protect the heavy investment of Plan participants' retirement savings in Old Second stock.

109.     As a result of the enormous erosion of the value of Company stock, the Plan's participants, the retirement savings of whom was heavily invested in Old Second stock, suffered unnecessary and unacceptable losses.

110.     Because of their high ranking positions within the Company and/or their status as Plan fiduciaries, Defendants knew or should have known of the existence of the above-mentioned problems.

111.     Defendants knew or should have known that, due to the Company's exposure to enormous losses stemming from the problems described above and the inevitable impact upon the value of Company stock, Old Second common stock was an imprudent investment option for

the Plan. Yet, Defendants failed to protect the Plan and their participants from foreseeable losses.

112. In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA. Defendants also failed to conduct an appropriate investigation into whether Old Second stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan's participants with information regarding Old Second's problems so that participants could make informed decisions regarding whether to include Old Second stock in their Plan accounts.

113. An adequate, or even cursory, investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Old Second stock was clearly imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

114. Because Defendants knew or should have known that Old Second was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Old Second stock.

115. Defendants had available to them several different options for satisfying this duty, including, among other things: divesting the Plan of Old Second stock; discontinuing further contributions to and/or investment in Old Second stock under the Plan; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; making appropriate public disclosures as necessary; and/or resigning as fiduciaries of the Plan to the extent that, as a result of their employment by Old Second, they

34

could not loyally serve the Plan and its participants in connection with the Plan's acquisition and holding of Old Second stock.

116. Despite the availability of these and other options, Defendants failed to take adequate action to protect participants from losses resulting from the Plan's investment in Old Second stock. In fact, Defendants continued to invest and to allow investment of the Plan's assets in Company stock even as Old Second's problems came to light. Indeed, in February 2008, in connection with the Company's acquisition of Heritage, Defendants invested an additional $25.2 million in Plan assets in Company stock—more than doubling the Plan's holdings of Old Second stock.

K. **CLAIMS FOR RELIEF UNDER ERISA**

117. At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

118. ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

119. ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

120. ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to

participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

121.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Chao v. Linder*, No. 05-CV-3812, 2007 WL 1655254, at *6 (N.D. Ill. May 31, 2007), *citing Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). They entail, among other things:

(a)    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

(b)    A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

(c)    A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

122.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

[I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

123. Plaintiffs therefore bring this action under the authority of ERISA §502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

## COUNT I

### Failure to Prudently and Loyally Manage the Plan's Assets (Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by all Defendants)

124. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

125. At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

126. Under ERISA, fiduciaries who exercise discretionary authority or control over management of a Plan or disposition of a Plan's assets are responsible for ensuring that investment options made available to participants under a Plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the Plan are prudently invested. Defendants were responsible for ensuring that all investments in the Company's stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan. Defendants are liable for losses incurred as a result of such investments being imprudent.

127. A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would

lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they director who are directed by the plan, including plan trustees, to do so.

128. Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding Plan investments/investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.

129. Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period these Defendants knew or should have known that, as described herein, the Old Second common stock was not a suitable and appropriate investment for the Plan. Investment in Company stock during the Class Period clearly did not serve the Plan's stated purpose. Yet, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable losses that they knew would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

130. Defendants further breached their duties of loyalty and prudence by failing to divest the Plan of Old Second stock when they knew or should have known that it was not a suitable and appropriate Plan investment.

131. Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Company's true financial condition and the Company's concealment of the same and, generally, by conveying inaccurate information regarding the Company's future outlook. During the Class Period, upon information and belief, the Company fostered a positive attitude toward the Company's stock, and/or allowed participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock. As such, participants in the Plan could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plan.

132. Defendants also breached their co-fiduciary obligations by, among their other failures knowingly participating in, or knowingly undertaking to conceal, each other's failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company stock. Defendants had or should have had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy them.

133. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment. Had Defendants taken appropriate steps to comply with their fiduciary obligations, participants could have liquidated some or all of their holdings in Company stock and thereby eliminated, or at least reduced, losses to the Plan.

134. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

**Failure to Adequately Monitor Other Fiduciaries and
Provide Them with Accurate Information (Breaches of Fiduciary Duties
in Violation of ERISA § 404 by Old Second and the Director Defendants)**

135.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

136.   This Count alleges fiduciary breaches against Old Second and the Director Defendants.

137.   At all relevant times, as alleged above, Old Second and the Director Defendants were fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

138.   At all relevant times, as alleged above, the scope of the fiduciary responsibility of Old Second and the Director Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, the Benefits Committee and other Company officers, employees and agents to whom fiduciary responsibilities were delegated.

139.   The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, that means that the monitoring fiduciaries, Old Second and the Director Defendants, had the duty to:

    (a)    Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

    (b)    Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

    (c)    Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plan's investments;

    (d)    Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(e)    Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investments; and

(f)    Ensure that the monitored fiduciaries report regularly to the monitoring fiduciaries. The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

140.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a Plan's assets, and must take prompt and effective action to protect a Plan and its participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a Plan and a Plan's assets.

141.    Old Second and the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge regarding the Company's business problems alleged above, which made Company stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company stock, an investment that was imprudent and subject to inevitable and significant depreciation. Old Second and the Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i) continuing to invest the assets of the Plan in Old Second common stock when it no longer was prudent to do so, and (ii) imprudently allowing the Plan to continue offering Old Second stock as an investment alternative. Despite this knowledge, Old Second and the Director Defendants failed to take action to protect the Plan, and concomitantly the Plan's participants, from the consequences of these fiduciaries' failures.

142.    In addition, Old Second and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information concerning the financial condition of Old Second that they knew or should have known that these Defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

143.    Old Second and the Director Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

144.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

145.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

L.    **CAUSATION**

146.    The Plan suffered millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in Company stock during the Class Period, in breach of Defendants' fiduciary duties, as reflected in the diminished account balances of the Plan's participants.

147.    Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and its participants would have avoided a substantial portion of the losses that they suffered through the Plan's continued investment in Company stock.

### M.     REMEDY FOR BREACHES OF FIDUCIARY DUTY

148.     As noted above, as a consequence of Defendants' breaches, the Plan suffered significant losses.

149.     ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

150.     With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

151.     Plaintiff, the Plan, and the Class are therefore entitled to relief from Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

152.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.      A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.      Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

E.      An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of Old Second maintained by the Plan in proportion to the accounts' losses attributable to the decline in Old Second's stock price;

F.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G       An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.      An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

DATED:      February 17, 2011          Respectfully submitted,

                                       **THE COLLINS LAW FIRM, P.C.**

                                       *Robert Dawidiuk*
                                       _____
                                       Shawn M. Collins
                                       Robert J. Dawidiuk
                                       1770 North Park Street
                                       Suite 200
                                       Naperville, Illinois 60563
                                       Phone: (630) 527-1595
                                       Facsimile: (630) 527-1193

                                       **BARROWAY TOPAZ KESSLER
                                       MELTZER & CHECK, LLP**
                                       Joseph H. Meltzer
                                       Edward W. Ciolko
                                       Mark K. Gyandoh
                                       280 King of Prussia Road
                                       Radnor, PA 19087
                                       Telephone:  (610) 667-7706
                                       Facsimile: (610) 667-7056

                                       *Attorneys for Plaintiffs and the Proposed Class*